OPINION OF THE COURT
BARRY, Circuit Judge.

I. Introduction

The Commonwealth appeals the order of the District Court granting David Copenhefer habeas relief from his sentence of death, and Copenhefer cross-appeals the District Court’s denial of habeas relief with respect to his conviction. We will reverse to the extent that the District Court vacated Copenhefer’s sentence of death, and affirm to the extent that it otherwise denied Copenhefer relief.

II. Procedural History

In March 1989, David Copenhefer was convicted in the Court of Common Pleas, Erie County, Pennsylvania, of first-degree murder, kidnapping, unlawful restraint, attempted robbery, attempted theft by extortion, and terroristic threats. The penalty phase began shortly thereafter, with the jury finding, as to the murder conviction, two aggravating circumstances and no mitigating circumstances. Based on the jury’s finding, a sentence of death was mandatory under Pennsylvania law. At the subsequent sentencing hearing, the court imposed the death sentence fixed by the jury, and consecutive sentences totaling twenty to forty years on the remaining counts. On appeal, the Supreme Court of Pennsylvania affirmed the conviction and sentence. Commonwealth v. Copenhefer, 526 Pa. 555, 587 A.2d 1353, 1354-55 (1991). Copenhefer then filed a petition pursuant to Pennsylvania’s Post Conviction Relief *380 Act (PCRA). The trial court denied the petition, and the Supreme Court again affirmed. Commonwealth v. Copenhefer, 553 Pa. 285, 719 A.2d 242 (1998).
In December 1999, Copenhefer filed a petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of Pennsylvania. He withdrew a second PCRA petition after the Commonwealth agreed to waive the exhaustion of state court remedies with respect to the claims in his § 2254 petition, and a third PCRA petition was dismissed as untimely.
The Magistrate Judge, in an extensive Report and Recommendation (App.42-157), recommended denying relief with respect to the conviction, but granting relief from the sentence of death on the ground that the trial court failed to instruct the jury that it was required to find that Copenhefer’s lack of a prior criminal record constituted a mitigating circumstance. The District Court, finding the objections of the parties to be without merit, adopted the Report and Recommendation as the Opinion of the Court, vacated Copenhefer’s sentence of death, and denied relief with respect to his conviction. Both parties appealed. We granted Copenhefer a certificate of appealability with respect to his claim that trial counsel rendered ineffective assistance by failing to challenge the Commonwealth’s theory that the victim lingered before dying and his claim that the Commonwealth exercised peremptory strikes to remove female jurors in violation of J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).[1]

III. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 2254, and we have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253. Because the District Court did not hold an evidentiary hearing, our review of its legal conclusions is plenary. Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.2001). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2241 et seq., habeas relief cannot be granted on a claim that was adjudicated on the merits in state court unless the adjudication resulted in a decision that was either “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States” or “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). If the state court did not reach the merits of a claim, these deferential standards do not apply. Holloway v. Horn, 355 F.3d 707, 718 (3d Cir.2004).

IV. Factual Background

In affirming the conviction and sentence on direct appeal, the Supreme Court of Pennsylvania accurately summarized the complicated facts of the kidnapping/murder scheme now before us, and the overwhelming evidence that supported the verdict:
On June 16, 1988, Sally Weiner received a telephone call purportedly from a congressman’s office asking that she meet with the caller to discuss arrangements for the presentation of a civic award to *381 her husband. The next day, around noon, she drove to the agreed meeting place, parked her car, and was never seen again alive. Several hours later, her husband, Harry, manager of the Corry office of Pennbank, received a telephone call playing a recorded message from his wife telling him she had been kidnapped and that the kidnapper demanded ransom money from the bank. Mr. Weiner was directed to retrieve a duffel bag from the parking lot outside his bank; the bag contained additional threats and instructions. Mr. Weiner called a vice president of the bank, as well as the bank’s security office, local police, state police, and the FBI. Mr. Weiner never received the additional radio instructions necessary to follow the directions contained in the duffel bag and therefore did not comply with the kidnapper’s demands.
Sally Weiner’s body was discovered two days later on June 19, 1988, in a rural area north of her home. She had died as the result of a gunshot wound to the back of her head.
Initial investigations by the FBI, state police, and local police resulted in the discovery of a series of computer-generated notes and instructions, each one leading to another, which had been concealed at various hiding places in and around Corry, Pennsylvania. The investigation also produced several possible suspects, including appellant, David Copenhefer, who owned a nearby bookstore, had had unproductive transactions with Mr. Weiner’s bank, and apparently had bad personal relations with the Weiners.
An examination of trash discarded from appellant’s store revealed drafts of the ransom note and directions. Subsequent search warrants resulted in seizure of incredibly comprehensive evidence against appellant. This included evidence tying appellant’s fingerprints, computer, weapons and ammunition, clothing, automobile, and materials from his home and office to the victim or the murder site.
His fingerprints appeared on the original ransom note and on some of the hidden notes. Police discovered rough drafts of the ransom note, a map of the hidden notes, as well as the notes and directions themselves in appellant’s handwriting, some of which bore his fingerprints. Appellant had a collection of guns, including two which might have fired the fatal bullet. He also had glazier ammunition, a nonstandard composition designed to fragment on impact so that after entering a body it will not exit and injure another person, of the type used to murder Mrs. Weiner. A metal rod from his home had been used to secure one of the hidden notes. Crepe paper torn from a roll at his store had been used to help secure another note. Human female skin tissue was found on his clothing. Tread marks matching appellant’s automobile tires were found at one hiding place and at the murder scene. Finally, appellant’s computer contained a series of drafts and amendments of the texts of the phone call to Mrs. Weiner on Thursday, the phone call to Mr. Weiner on Friday, the ransom note, the series of hidden notes, and a twenty-two point plan for the entire kidnapping scheme.
Copenhefer, 587 A.2d at 1354-55.

V. Discussion

A. The Commonwealth’s Appeal

Adopting the Report and Recommendation of the Magistrate Judge, the District Court concluded that the stipulated fact that Copenhefer had no prior criminal record constituted a mitigating circumstance *382 as a matter of law, and the failure-of the trial court to so instruct the jury and the jury to find it as such violated the Eighth Amendment. The District Court vacated the sentence of death, and the Commonwealth appeals. We will reverse.
At the outset, we set forth the rather extensive background of what brings us to this point. At the start of the penalty phase, the trial court gave preliminary instructions to the jury with respect to aggravating and mitigating circumstances, describing in a general sense what they are — those things, for example, about the murder and the murderer that make the case more terrible or less terrible and more or less deserving of the death penalty — and also those specific aggravating and mitigating circumstances at issue in this case that are listed in the Pennsylvania Sentencing Code. As relevant here, “[mjitigating circumstances spelled out in the Statute,” the court told the jury, “would be when the killer has no significant history of prior criminal convictions.” App. 4456; see 42 Pa.C.S. § 9711(e)(1) (“mitigating circumstances shall include ... [that] the defendant has no significant history of prior criminal convictions.”). Also, the jury was told, it may consider “any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense.” Id. Defense counsel and the Commonwealth then orally advised the jury that they had entered into a stipulation that Copenhefer had no prior criminal convictions.
Mrs. Copenhefer and the Copenhefers’ son took the stand and testified as to their relationships with Copenhefer and his involvement in the church and community. Counsel thereafter gave their closing arguments, with defense counsel arguing that several mitigating circumstances had been established: Copenhefer’s relationship with his son, his relationship with his wife, that he did not abuse drugs or alcohol, that he had never physically abused his wife, the importance of religion to him, his intelligence and ability to assist other inmates, that he helped his parents with their meat business, his good behavior during trial, and the value of his life to his family. With respect to the lack of a criminal record, counsel argued:
Now, with regards to the one mitigating circumstance, which we’ve already referred to, the fact that he has no prior convictions, [the prosecutor] stood up and stipulated to that, and I suggest to you that speaks for itself. In other words, we have established that clearly that mitigating circumstance exists. And that, therefore, you should take that directly into consideration in making your determinations.
App. 4471. Relying on the evidence presented at trial, the Commonwealth sought to establish the aggravating factors that Mrs. Weiner was held for ransom and the murder was committed during the course of a felony. See 42 Pa.C.S. § 9711(d)(3) & (6).
Following the closing arguments of counsel and in anticipation of the final instructions it would give the jury, the trial court discussed with counsel whether it should or should not direct the jury to find as a matter of law that the stipulated fact that Copenhefer had no prior record was a mitigating circumstance. The Commonwealth argued that the weight of the fact that Copenhefer had no prior record, i.e. whether that fact rose to the level of a mitigating circumstance, remained for the jury to decide — the stipulation that there was no prior record was not, it was argued, a stipulation that no prior record constituted a mitigating circumstance. Defense counsel argued that whatever the weight of the fact of no prior record, it was *383 a proven mitigating circumstance by virtue of the stipulation. The trial court agreed with the Commonwealth, and proceeded to give its final instructions to the jury, clearly and thoroughly explaining, among other things, what, if proven in accordance -with the appropriate standard of proof, would constitute aggravating and mitigating circumstances including, as relevant here, “the following matters” under the Sentencing Code: “First, the defendant has no significant history of prior criminal convictions; and, second, any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense.” App. 4507. There were no objections to the instructions, nor any suggestions for corrections or additions.
We quote at some length from the trial court’s final instructions, and particularly its thorough explanation of mitigating circumstances, to provide context for the legal analysis to which we will shortly turn our attention.
[A] mitigating circumstance may arise from any of the diverse frailties of mankind. Mitigating circumstances are any facts relating to the defendant’s character, education, environment, mentality, life and background, or any aspect of the crime itself which may be considered extenuating, or as reducing his moral culpability, or making him less deserving of the extreme punishment of death. You may consider as mitigating circumstances any circumstance which tends to justify the penalty of life imprisonment.
In this case, under the Sentencing Code, the following matters, if proven to your satisfaction by a preponderance of the evidence, can be mitigating circumstances:
First, the defendant has no significant history of prior criminal convictions; and, second, any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense.
[E]ach of you is free to regard a particular mitigating circumstance as present despite what other jurors may believe. This difference treatment of aggravating and mitigating circumstances is one of the law’s safeguards against unjust death sentences. It gives a defendant the full benefit of any mitigating circumstances.
* * *
You must consider all evidence of mitigation. The weight which you give to a particular mitigating circumstance is a matter for your moral, factual, and legal judgment. However, you may not refuse to consider any evidence in mitigation which has been proven to your satisfaction by a preponderance of the evidence. I charge you that you must consider the mitigating circumstances offered by the defendant. This does not mean that you must accept them as mitigating circumstances, for you shall only do that if one or more of you determines that those mitigating circumstances have been proven by a preponderance of the evidence.
The list of mitigating circumstances offered cannot limit your deliberations, since you are free to consider any aspect of the crime or of the character of the defendant as mitigating in your sole discretion.
App. 4505, 4507-10.
The jury commenced its deliberations, reaching its verdict a few hours later. Pri- or to the announcement of the verdict, the trial court reviewed the verdict form, and noted that it had not been filled out cor *384 rectly, twice handing it back to the foreman for correction. When the form was initially reviewed, the words “first offense” had been written in by the jury in response to the question of whether a mitigating circumstance had been found by one or more of the jurors. The form was, however, missing a check mark in the box indicating whether the aggravating circumstances unanimously found outweighed that one mitigating circumstance, and the form was, therefore, returned to the foreman. The foreman crossed out “first offense,” but mistakenly placed the check mark in the “weighing” box where, given the crossout indicating that no mitigating circumstance had been found, it should not have been placed. The form was again corrected and, as finally returned, clearly showed, and the foreman announced, that the jury found the sentence to be death on the basis that there was at least one aggravating circumstance and no mitigating circumstance. Each juror, when polled, agreed. The verdict mandated a sentence of- death under 42 Pa.C.S. § 9711(c)(l)(iv) (“the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance.”).
Relying only on Pennsylvania caselaw and statutes, Copenhefer argued on direct appeal that the trial court erred by refusing to instruct the jury that his lack of a prior record.was a mitigating circumstance as a matter of law. , However, the Supreme Court of Pennsylvania found:
The verdict slip ... indicates clearly that the jury did consider evidence of mitigation — viz., that appellant had no significant history of prior criminal convictions. Any apparent confusion in the proceedings has to do with filling out the verdict slip, and the colloquy which occurred when the jury returned its verdict did not clarify the process. But it is readily apparent that the jury did follow the court’s instructions in considering appellant’s lack of a prior record during its deliberations.
Copenhefer, 587 A.2d at 1360. . The Court addressed the issue as a matter of state law, and concluded that the sentence was not the product of passion, prejudice, or any arbitrary factor.
In Commonwealth v. Rizzuto, 566 Pa. 40, 777 A.2d 1069 (2001), however, the Supreme Court of Pennsylvania overruled its decision in Copenhefer and held that where the absence of prior convictions is not in dispute, the jury has no discretion not to find that absence as a mitigating circumstance. The Court noted that
[i]f we would grant the jury discretion to ignore stipulations of fact, we would be granting the right to arrive at a sentencing verdict in an arbitrary and capricious fashion. Such a conclusion would undercut the very purpose of the death penalty sentencing scheme as developed by our General Assembly. A sentence of death cannot be “the product of passion, prejudice or any other arbitrary factor.” 42 Pa.C.S. § 9711(h)(3)(i).
Id. at 1089. Copenhefer filed a third PCRA petition and raised a state law claim based on Rizzuto, a petition denied as untimely. The Court affirmed the denial, stating: “[W]e used the ‘arbitrary and capricious’ language in Rizzuto to indicate the danger of ‘undercutting] the very purpose of the death penalty sentencing scheme as developed by our General Assembly.’ We did not expressly discuss the United States Constitution or any constitutional rights.” Commonwealth v. Copenhefer, 596 Pa. 104, 941 A.2d 646, 650 n. 7 (2007) (citation omitted). Thus, Copenhefer’s third PCRA petition did not fit into the exception to the PCRA’s limitations *385 period for newly created, retroactively applied constitutional rights. Id. at 650.[2]
The District Court reviewed the Eighth Amendment claim de novo after concluding that on direct appeal the Supreme Court of Pennsylvania had not even mentioned any such claim, much less decided one on the merits. We agree with the District Court that review of this claim is de novo given that the only claim on direct appeal was based solely on state law. The federal claim was not, however, defaulted because the Commonwealth waived exhaustion.
The Commonwealth argues that the jury initially found the mitigating circumstance of Copenhefer’s lack of a prior record when it wrote on the verdict form, though later crossed out, “first offense,” and that any confusion occurred only when the trial court tried to clarify the form. Whatever merit there may be to that argument and whether confusion may have preceded the jury’s ultimate announcement that no mitigating circumstance was found, we are bound by that finding. Even on that understanding, however, there was no constitutional error.
Buchanan v. Angelone, 522 U.S. 269, 272-73, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), which held that the Eighth Amendment does not require a capital jury to be instructed on the concept of mitigating evidence generally or on particular statutory mitigating factors, resolves the issue before us. In Buchanan, the jury was instructed that if it found that petitioner’s conduct in committing the murders was outrageously vile, it could sentence him to death. If, however, it believed from all the evidence that the death penalty was not justified, it could sentence him to life imprisonment. Petitioner requested additional instructions on four mitigating factors that were specifically listed in the Virginia Code. The trial court refused to give the instructions. On its verdict form, the jury indicated that it had considered the evidence in mitigation and unanimously fixed the penalty at death.
Petitioner argued to the Supreme Court that the Eighth Amendment required the trial court to “instruct the jury on its obligation and authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State.” Buchanan, 522 U.S. at 275, 118 S.Ct. 757. The Supreme Court rejected the argument, observing that, “[n]o such rule has ever been adopted by this Court.” Id. It explained that, in the selection phase of the capital sentencing process, it has “emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination,” and “the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence.” Id. Its “consistent concern” has been that the jury not be precluded from being, able to give effect to mitigating evidence — it has “never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence.” Id. at 276, 118 S.Ct. 757. The Court emphasized that the standard was “whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.” Id. (quoting Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).
*386 Copenhefer does not argue, nor could he credibly do so, that the jury was not given extensive instructions on the concept of mitigating evidence generally or that it was not instructed on the particular statm tory mitigating circumstance at issue here — his lack of a prior- record; indeed, one could well make thé case that that is game, set, and match given the holding of Buchanan. Rather, .Copenhefer argues only that the jury should have been instructed to find that the stipulated fact that he had no prior record was, as a matter of law, a mitigating circumstance.[3]
In support of his argument, Copenhefer cites Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and Penny v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), which require the jury to “give effect to” the mitigating evidence, and he emphasizes the following language from Penny: “Eddings makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence.” Penny, 492 U.S. at 319, 109 S.Ct. 2934. As did the District Court, Copenhefer reads the language “jgive effect to” in this passage as being modified only by “must” — “[t]he sentencer must also [ ] give effect to that evidence in imposing sentence,” i.e., must find it to be a mitigating circumstance. We conclude, however, that the phrase “be able to” modifies “give effect to” as well as “consider,” i.e., “[t]he sentencer must also be able to consider and [be able to] give effect to that evidence in imposing sentence.” The facts of Penny and Eddings and, of course, the facts and holding of Buchanan clearly support our conclusion.
We but briefly address Penny and Ed-dings and then only to show how distinguishable they are on the facts from the case at hand. In Eddings, the trial court, as the sentencer, found that it could consider the age of the capital defendant as a mitigating factor but determined that, as a matter of law, it could not consider his family history. Similarly, the state appellate court appeared to consider evidence as mitigating only when it would support a legal excuse from liability. The Supreme Court found that these restrictions violated Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978):
Just as the state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.
Eddings, 455 U.S. at 113-14, 102 S.Ct. 869. (emphasis in original). Here, the jury was not instructed to disregard Copenhefer’s lack of a prior record or to give it no weight — indeed, quite the contrary was instructed — and there is no evidence that the jury refused to consider it.[4] Al *387 though the jury did not ultimately find a mitigating circumstance, the record strongly suggests that it considered the mitigating evidence and decided that none of that evidence was qualitatively sufficient to constitute a mitigating circumstance.
In Penry, the jury was given three special questions, and if it answered all of them in the affirmative, the trial court was required to sentence the defendant to death. The questions concerned whether the conduct of the defendant was deliberate, whether he posed a continuing threat to society, and whether his conduct was an unreasonable response to provocation by the victim. The Supreme Court noted that “[t]he jury was never instructed that it could consider the evidence offered by Penry as mitigating evidence and that it could give mitigating effect to that evidence in imposing sentence,” Penry, 492 U.S. at 320, 109 S.Ct. 2934, and determined that the jury, confined to the three questions posed to it, had not been empowered to give effect to Penny's mitigating evidence in answering the special questions.
In the absence of jury instructions defining “deliberately” in a way that would clearly direct the jury to consider fully Penry’s mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry’s mental retardation and history of abuse in answering the first special issue.
Id. at 323, 109 S.Ct. 2934. The Court then discussed the other two special questions and concluded that “a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence.” Id. at 326, 109 S.Ct. 2934. Aside from its facts, the lesson of Penry is that the jury must be able to give effect to the mitigating evidence; it is not required to do so.
Here, as in Buchanan, the jury was not only not precluded from considering Copenhefer’s lack of a prior record or any other mitigating evidence, but it was instructed that it must consider the mitigating evidence, and no constraint was placed on the manner in which it could give effect to that evidence. Had the jury been of the view that, based on the mitigating evidence, Copenhefer did not deserve to be sentenced to death, it was fully empowered to find that his lack of record, or any other mitigating evidence presented, constituted a mitigating circumstance, weigh that circumstance or those circumstances against the aggravating circumstances, and sentence him to life imprisonment. But in no way was the evidence “exclu[ded] from meaningful consideration by the jury.” Abdul-Kabir v. Quarterman, 550 U.S. 233, 250, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007). To the contrary, Copenhefer’s jury was “permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence.” Id. at 260, 127 S.Ct. 1654. And, as the Supreme Court reiterated in Buchanan, “complete jury discretion is constitutionally permissible.” 522 U.S. at 276, 118 S.Ct. 757 (citation omitted).
Parenthetically, it is difficult for us to imagine that the outcome in this case would have been different even if the jury had been specifically instructed to find that Copenhefer’s lack of a prior record was a mitigating circumstance. As it was, the jury was instructed that each juror was free to find for himself or herself that *388 a mitigating circumstance was present despite what the other jurors believed. Thus, the verdict rendered by Copenhefer’s jury indicates that not a single juror believed that his lack of a prior record— or, indeed, any of the many potential mitigating factors argued by defense counsel— mitigated the painstakingly planned murder about which the jury heard at trial.
For the reasons we have stated, we simply cannot conclude that Copenhefer has established any likelihood, much less a reasonable likelihood, that the jury applied the instructions — or, more precisely, as in Buchanan, the lack of an instruction — in a way that violated the Eighth Amendment. Because the District Court erred in finding an Eighth Amendment violation, we will reverse its order vacating the sentence of death.
B. Copenhefer’s Appeal
1. Ineffective Assistance of Counsel
We granted a certificate of appealability on Copenhefer’s claim that his trial counsel provided constitutionally ineffective assistance by failing to call an expert witness to rebut the Commonwealth’s evidence that Mrs. Weiner did not die immediately upon being shot but, rather, “lingered” before dying. The District Court rejected that claim. We do so as well.
Mrs. Weiner was last seen early on a Friday afternoon in June 1988. Dr. Antonio I. German, a clinical pathologist, testified on behalf of the Commonwealth that she had died at some point between midnight on Friday and 2 p.m. on Saturday. He also testified that it was possible that her brain stem was not completely destroyed by the gunshot and that it was probable that she lingered in a coma before dying. Dr. K.C. Kim, a forensic entomologist, testified — also for the Commonwealth — that, based on insect activity on the body, Mrs. Weiner died between 5 p.m. and 8 p.m. on Friday. Detective Mark Watts testified for the Commonwealth, as well, relating a conversation he had with Copenhefer not long before trial in which Copenhefer told him that he demonstrated to other inmates how to shoot a person in the head without severing the medulla so that the person does not die right away. During closing arguments, the Commonwealth cited the testimony of both Dr. German and Dr. Kim to argue that Copenhefer shot Mrs. Weiner on Friday afternoon and she lingered before dying between 5 p.m. and 8 p.m. In his closing, Copenhefer’s trial counsel argued that Copenhefer had an alibi starting at 5 p.m., when he returned to his bookstore.
Copenhefer raised this ineffectiveness claim in his first PCRA petition. At the PCRA hearing, his trial counsel testified that he had reviewed the medical records in the case and read quite a bit about forensic pathology, time of death, and how fruit flies grow. He stated that he tried to show at trial that Dr. Kim’s testimony was inaccurate, and explained that Dr. German’s testimony was beneficial to the defense because he placed the time of death on Saturday, when Copenhefer had an alibi. Given that, counsel stated, there was no reason, particularly in the midst of trial, to find a defense expert. Indeed, it was during trial when Dr. German first mentioned the possibility that Mrs. Weiner lingered before dying, and there does not appear to be any evidence that counsel was, or should have been, aware before trial that Dr. German would testify about this theory. Counsel explained that
all of the reports we had from him indicated that the time of death was at a certain period of time and that that was consistent with the shooting. That being the case, [Dr. German’s] testimony was beneficial to the defense because it was consistent with when Mr. Copenhe *389 fer could not have done what he is accused of doing. It was not until [Dr. German] indicated that it’s possible that she could have lingered, and that was during his trial testimony, as I recall, and not prior to that.
Supp.App. at 141. Copenhefer presented the testimony of Dr. Cyril Wecht, a forensic pathologist, who testified that the medulla was not intact and that Mrs. Weiner died within a minute or two of being shot.
The PCRA court noted that trial counsel testified he was satisfied with Dr. German’s time of death testimony. Had counsel challenged the time of death, the court stated, he would have opened up further attacks on Copenhefer’s credibility concerning his whereabouts. The court concluded that this was a valid strategy and that counsel did not perform unreasonably. The Supreme Court of Pennsylvania also noted trial counsel’s satisfaction with Dr. German’s testimony as to the time of death. With respect to the lingering death theory, the Court concluded that Copenhefer claimed only that his counsel performed unreasonably by failing to call an expert to “critically evaluate,” in rebuttal, the Commonwealth’s expert testimony, and that it would not consider counsel ineffective for failing to do so. Copenhefer, 719 A.2d at 254 n. 12.
To succeed on his claim of ineffectiveness, Copenhefer was required to demonstrate that (1) counsel’s representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel’s error, the result would have been different. Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (citing Strickland v. Washington, 466 U.S. 668, 687-96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). As to the first prong, there is a strong presumption that counsel’s conduct was reasonable. Id.
The Report and Recommendation, adopted by the District Court, found reasonable the Supreme Court of Pennsylvania’s conclusion that trial counsel’s performance was not deficient. It noted that the PCRA testimony showed that counsel had sound reasons for not challenging Dr. German’s testimony that Mrs. Weiner might have lingered before dying, and that counsel believed that Dr. German’s testimony was beneficial to Copenhefer. It also concluded that, even if counsel’s performance was deficient, Copenhefer could not show prejudice. Noting that uncontradicted evidence proved that Copenhefer killed Mrs. Weiner whether or not she lingered before dying, it concluded that even if trial counsel had challenged the theory that Mrs. Weiner lingered before dying, the result of the trial would have been the same.
We conclude that Copenhefer simply cannot show prejudice from this claim of ineffective assistance of counsel. We need not, therefore, determine whether trial counsel performed unreasonably by failing to anticipate that the Commonwealth would use the lingering death theory of one expert, Dr. German, while rejecting that expert’s time of death, and also use the time of death of another expert, Dr. Kim, or that counsel failed, in the middle of a four-week trial, to find an expert to rebut the belatedly advanced “lingering death” theory.
Because the Supreme Court of Pennsylvania did not address the prejudice prong of the Strickland test, the District Court properly reviewed the issue de novo. Holloway, 355 F.3d at 718. To establish prejudice, Copenhefer was required to show a reasonable probability that, but for counsel’s error, the result would have been different. Strickland, 466 U.S. at 687-96, 104 S.Ct. 2052 (1984). “A reasonable probability is a probability sufficient to *390 undermine confidence in the outcome.” Id. at 694, 104 S.Ct. 2052. In light of the overwhelming evidence against Copenhefer, we agree with the District Court that he cannot show he was prejudiced.
Even if trial counsel had presented expert rebuttal testimony suggesting that it was not possible that Mrs. Weiner lingered before dying, the jury also had before it Dr. German’s testimony to the contrary. Moreover, and as noted by the District Court, even if Mrs. Weiner did not linger before dying, it was still possible for Copenhefer to have shot her around 5 p.m. and then to have driven to his bookstore, arriving sometime after 5 p.m. Citing the testimony of three witnesses, Copenhefer argues that the lingering death theory was important because he had an alibi from 5 p.m. on and the experts put the earliest time of death at 5 p.m. But the testimony of these three witnesses does not, in fact, support a 5 p.m. alibi. When asked when she saw Copenhefer that afternoon, his wife testified “I can’t give an exact time. Sometime between 5:00 and 6:00.” App. 3862. When asked a similar question, she said “5:30, something like that.” Id. at 3865. David Zimmer, a bank employee, testified that when he heard that Mrs. Weiner had been kidnapped, he left the bank’s Erie branch at 5 p.m. and arrived in Corry around 6:30 or 7 p.m., and that Copenhefer was in the bookstore when he went by. Trooper Johnston testified that Copenhefer was at the bookstore at approximately 5 p.m., but admitted that that was not based on personal knowledge. Copenhefer ignores his own testimony that he arrived back at his bookstore around 5:20 p.m.
According to the 22-point plan found on his computer, Copenhefer intended to kidnap Mrs. Weiner, have her tape a message to her husband, and then kill her before leaving the bag with the ransom note and making the call to her husband. This timeline is consistent with the theory that Copenhefer killed Mrs. Weiner early in the afternoon and that she lingered before dying later that evening. When questioned by the police, Copenhefer spoke openly about where .he had been Friday evening through Sunday, but he refused to discuss his whereabouts on Friday afternoon. Moreover, and perhaps most importantly, Copenhefer told a detective that he had demonstrated to other inmates how to shoot a person in the head without severing the medulla so that the person “linger[s]” before dying. App. 3163-64. These pieces of evidence all support the theory that Copenhefer shot Mrs. Weiner in the early afternoon and that she, indeed, lingered before dying, perhaps as early as 5 p.m., as Dr. Kim had testified.
The evidence that Copenhefer committed the calculated kidnapping and murder of Mrs. Weiner, and did so alone, was overwhelming. The compelling evidence of guilt included the documents recovered from his computer, including the drafts of his call to Mrs. Weiner, the recorded call from Mrs. Weiner to her husband, the ransom note, the notes at the drop sites, and the 22-point plan. An FBI metallurgist testified that the rods found at the drop sites were made within minutes of those found in Copenhefer’s backyard. The tears on the crepe paper found at a drop site matched the tear pattern on the roll found in his store. Copenhefer’s fingerprints were found on notes at the drop sites, and a note in his wallet matched up with the plan on his computer.
We cannot say that Copenhefer has established any reasonable likelihood that the result would have been different even if trial counsel had been able to rebut the lingering-death theory. As the Magistrate Judge aptly noted, “Copenhefer seeks to make time of death the only issue in this *391 case. To prove its ease, the Commonwealth had to prove murder, not time of death. On this point, the Commonwealth made out an overwhelming case.” App. 109. We will affirm the District Court’s denial of the “fingering death” claim.
2. The J.E.B. Claim.
We also granted a certificate of appealability on Copenhefer’s claim that the prosecution used peremptory strikes to remove female jurors, in violation of J.E.B., 511 U.S. 127, 114 S.Ct. 1419. Copenhefer concedes, however, that under Abu-Jamal v. Horn, 520 F.3d 272, 284 (3d Cir.2008), he cannot prevail because he' is unable to show contemporaneous objections to the strikes that he believes violated equal protection, and that he simply wishes to preserve the claim for possible future review. We will, nonetheless, briefly address his claim on the merits. It resoundingly fails.
The J.E.B. claim was not presented to the Pennsylvania state courts. The District Court, however, properly reviewed the claim, as the Commonwealth had waived exhaustion. Because there was no adjudication on the merits in the state court, we, of course, are not concerned with an issue of AEDPA deference. Holloway, 355 F.3d at 718. The District Court denied the claim because it found that retroactive application of J.E.B. was barred by Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), an issue we need not and do not reach given Copenhefer’s failure to have made even a prima facie showing that the Commonwealth exercised peremptory strikes on the basis of gender.
All relevant circumstances must be considered in determining whether a prima facie showing has been made. Holloway, 355 F.3d at 722. In Holloway, we cited five generally relevant factors: “1) the number of [female] members in the panel; 2) the nature of the crime; 3) the [gender] of the defendant; 4) a pattern of strikes against [females]; and 5) the questions and statements during the voir dire.” Id. With respect to the first factor, Copenhefer states that twenty-eight of the sixty-one jurors who were individually questioned during voir dire were female. He does not make any argument as to how the nature of the crime affects the analysis, nor does he point to any disparate questioning or treatment of female jurors. He relies solely on the Commonwealth’s alleged pattern of strikes.
In the District Court, Copenhefer set forth the percentage of female jurors struck by the prosecution (11 out of 20 or 55%) and the percentage of prosecution strikes used to strike female jurors (11 out of 19 or 58%). He computed some statistics using these numbers — there were, for example, 1.38 peremptory strikes of female jurors for every strike of a male juror— but did not explain whether and how these statistics were significant. Moreover, the final composition of the jury was six females and nine males. The three alternates were male; so there was an equal number of each gender on the jury that actually deliberated. Before us, Copenhefer points to the striking of specific female jurors; however, in the District Court, he did not single out any female juror as being impermissibly struck.
The numbers presented by Copenhefer do not show a pattern of strikes on the basis of gender, nor do they raise an inference of discrimination. Simply put, Copenhefer has not shown that “there is some reason to believe that discrimination might be at work.” Johnson v. Love, 40 F.3d 658, 663 (3d Cir.1994) (quoting United States v. Clemmons, 892 F.2d 1153, 1156 (3d Cir.1989)). Accordingly, we will affirm the District Court’s denial of relief with respect to this claim.

*392
VI. Conclusion

With reference to the guilt phase of the trial, the Magistrate Judge concluded that although Copenhefer had raised a number of claims for relief, he had not demonstrated that his conviction was compromised by any federal constitutional violations, and that the Commonwealth had marshaled an overwhelming amount of evidence linking Copenhefer directly to the kidnapping and murder of Sally Weiner. The Magistrate Judge recommended that guilt-phase relief under 28 U.S.C. § 2254 be denied. The District Court adopted the Report and Recommendation as to the guilt phase claims.
The Magistrate Judge then reached the penalty phase claims, noting, at the outset, that it is “no part of the court’s job to determine whether this sentencing hearing, or any state criminal proceeding, was ‘ideal’; the court is charged, only with scouring the trial record for federal constitutional errors that had a substantial and injurious effect on the jury’s deliberations.” App. 130. Having done so, the Magistrate Judge found that the record disclosed but one, the one we have addressed at some length, and recommended relief only as- to that claim, thus effectively recommending a denial of relief as to the sentencing claims that did not meet the requisite federal standard. Not surprisingly, Copenhefer took no issue with those recommendations, and the District Court adopted the Report and Recommendation as to the penalty phase claims. But whether decision on any remaining sentencing claims was implicitly denied or whether decision on any such claims was simply deferred, we have considered all of those claims, and conclude that they fail as a matter of law.[5]
*393 For the reasons we have stated, we will reverse the order of the District Court to the extent that it granted Copenhefer relief from his sentence of death. In all other respects, we will affirm the judgment of the District Court.

. The case was first argued before us in June 2005, following which we stayed the appeal pending the decision of the Supreme Court of Pennsylvania on Copenhefer's appeal from the dismissal of his third PCRA petition. In December 2007, that dismissal was affirmed. Commonwealth v. Copenhefer, 596 Pa. 104, 941 A.2d 646 (2007). We ordered supplemental briefing and we again heard argument prior to rendering this decision.

. In addressing the District Court’s jurisdiction over the sentencing claim, Copenhefer conceded, "Rizzuto does not contain any discussion of the Eighth Amendment issues raised in Claim III of the petition.” Pet. Mem. Addressing Jurisdiction at 6 (emphasis in original).

. In Buchanan, the Virginia Code at issue stated that mitigating circumstances "may include” the lack of a significant criminal history. Here, the Pennsylvania Code uses the mandatory language "shall include.” This difference in state law is, of course, not dis-positive as to the constitutional issue before us.

. That the jury initially wrote down "first offense” instead of "no significant history of prior criminal convictions” indicates that it *387 heard and remembered the stipulation and the defense argument that Copenhefer had no prior convictions (as opposed to some insignificant ones); notably, it did not just copy what was listed on the verdict form as one of the potential mitigating circumstances.

. (I) Treating Copenhefer's factual allegations as true, counsel's penalty phase investigation into Copenhefer's personality disorder, paranoia, and head injury for the purpose of developing mitigating evidence and his performance at the penalty phase with reference thereto were not unreasonable. Counsel retained an expert who performed a mitigation investigation and diagnosed Copenhefer with Antisocial Personality Disorder. Counsel then made a strategic decision not to present that evidence. (II) & (IX) Copenhefer was not entitled to a jury instruction that he was not eligible for parole. Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994); O’Dell v. Netherland, 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). (Ill) Counsel did, in fact, argue for an instruction that the jury must find Copenhefer’s lack of a criminal record as a mitigating circumstance. Counsel was not ineffective for failing to object to the Commonwealth's argument that no mitigating evidence existed. The Commonwealth’s actual argument was that there were "no true mitigating circumstances of merit in this particular case.” App. 4489 (emphasis added). (V) The jury did not rely on non-statutory aggravating factors. See 42 Pa.C.S. § 9711(a)(2) (1989). To the extent that it did, the Eighth Amendment was not violated. Barclay v. Florida., 463 U.S. 939, 956, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); Lesko v. Owens, 881 F.2d 44, 57-59 (3d Cir.1989). (VI) The trial court did not err in allowing the kidnapping of the victim to establish both aggravating circumstances. Iones v. United States, 527 U.S. 373, 398-400, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). (VII) Counsel for the Commonwealth did not engage in misconduct in his closing argument. Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); Barefoot v. Estelle, 463 U.S. 880, 896, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983); Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). (VIII) The Commonwealth did not violate Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (X) The Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 50-51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), and Copenhefer has not shown that the state court did not undertake its review in good faith. Riley v. Taylor, 277 F.3d 261, 311-12 (3d Cir.2001) (citing Walton v. Arizona, A91 U.S. 639, 656, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)). (XI) A disagreement between experts does not establish a claim that false and misleading testimony has been presented. (XIII) Counsel was not ineffective *393 for failing to argue at sentencing that Copenhefer was not the sole perpetrator of the offense. The evidence is overwhelming that Copenhefer acted alone.